UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* John Doe,<br><br>Plaintiffs,<br><br>v.<br><br>RECOVERY HOME CARE, MARK CONKLIN and GLEN CASTILLO,<br><br>Defendants. | **RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.***<br><br>**FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>CIVIL ACTION NO.<br>8:12 cv 2495 23 TBM<br>**JURY TRIAL DEMANDED** |

FILED

**RELATOR'S COMPLAINT PURSUANT TO
THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.*
AND PENDENT STATE FALSE CLAIMS ACTS**

John Doe ("Relator"), on behalf of the United States, brings this action for violations of the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("False Claims Act"), to recover all damages, civil penalties and all other recoveries provided for under the False Claims Act.

## I.    THE PARTIES

1.  Defendant Recovery Home Care ("RHC") provides a full range of in-home care and health services as well as specialized programs to Medicare beneficiaries. RHC's main office is located at 1897 Palm Beach Lakes Blvd, Suite 208, West Palm Beach, FL 33410.   In addition to the office in West Palm Beach, RHC has four offices in the following locations: (1) 701 East Commercial Blvd, Suite 250 Ft. Lauderdale, FL 33334; (2) 5585 Marquesas Circle Sarasota, Fl. 34233-3332; (3) 8564 E CR 466, Suite 201, The Villages, FL 32159; and (4) 465 NW Prima Vista Blvd., Port St. Lucie, FL 34983.

2.  At all relevant times hereto, defendant Mark Conklin ("Conklin") owned and operated RHC.  Conklin had knowledge of the scheme alleged herein and detailed below, and authorized and instructed sales representatives to engage in the scheme.

3.  At all relevant times hereto, defendant Glen Castillo ("Castillo") is/was the RHC Head of Sales to whom the RHC sales representatives from all five offices reported to.  Castillo had knowledge of the scheme alleged herein and detailed below, and authorized and instructed sales representatives to engage in the scheme.

4.  Castillo, Conklin and RHC will collectively be referred to herein as ("Defendants").

5.  The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid Programs.

6.  Relator John Doe is a citizen of the United States and a resident of Florida.  Relator graduated with a Bachelor of Business Administration and earned a Masters of Mental Health. Relator worked as an RHC sales representative from January through September 2012.

7.  Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1).  Relator brings this action on behalf of the United States for violations of the Federal False Claims Act.

8.  Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

## II.  SUMMARY OF THE CASE

9.  Throughout the relevant period, RHC provided remuneration to physicians to induce patient referrals and reward physicians for prior referrals and assisted these physicians in billing for Care Plan Oversight, all in violation of the Anti- Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b. In addition, because RHC's payment of remuneration to physicians created a financial relationship, physicians with these financial relationships with RHC violated the Stark Law, 42

U.S.C. § 1395nn, when they established a practice of care or certified a patient for RHC home health services; in other words "referred" patients, to RHC.

10. At all relevant times, RHC knew that it was not entitled to payment for services procured through violations of the AKS and Stark Law.

11. Relator's claims against Defendants are based upon false certifications and false or fraudulent claims that Defendants presented or caused to be presented to Medicare for services provided to patients referred by physicians with whom RHC had illegal financial relationships under the AKS and Stark Law.

### III.    JURISDICTION AND VENUE

12. Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

13. Venue in the Middle District of Florida is appropriate under 31 U.S.C. § 3732(a) and sufficient contacts exist for jurisdiction in that RHC transacts or transacted business in the Middle District of Florida.

### IV.    THE APPLICABLE LAW

#### A.    The Federal False Claims Act

14. The Federal False Claims Act provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

* * *

3

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

15. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### B.     The Federal Anti-Kickback Statute

16. The AKS, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare program from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.   *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

17. The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

4

whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S .C. § 1320a-7b(b). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.

42 U.S.C. §1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).   Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).

18. The AKS and the corresponding regulations establish a number of "safe harbors" for common business arrangements. The safe harbors protect arrangements from creating liability under the statute. An arrangement must fit squarely in a safe harbor to be protected. Safe harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation. Once the plaintiff proves that the AKS applies, the burden shifts to the defendant to prove that its conduct fits within one of the exceptions.

C.    **Stark Law**

19. The Stark Law prohibits home health agencies ("HHA") from submitting claims to Medicare for services provided to patients who were referred by a physician with whom the provider has an impermissible "financial relationship." 42 U.S.C. § 1395nn(a)(1). Stark was designed by Congress to remove monetary influences from physicians' referral decisions, and thereby protect federal health care programs from paying for the costs of questionable utilization

5

of services. The Stark Law establishes a presumptive rule that providers may not bill, and

Medicare will not pay, for certain health care services generated by a referral from a physician

with whom the provider has a financial relationship.

20. In relevant part, the Stark Law states:

(a) Prohibition of certain referrals

(1) In general
Except as provided in subsection (b) of this section, if a physician (or an immediate
family member of such physician) has a financial relationship with an entity specified in
paragraph (2), then –

(A) the physician may not make a referral to the entity for the furnishing of
designated health services for which payment otherwise may be made under
this subchapter, and

(B) the entity may not present or cause to be presented a claim under this
subchapter or bill to any individual, third party payor, or other entity for
designated health services furnished pursuant to a referral prohibited under
subparagraph (A).

* * * * *

(g) Sanctions

(1) Denial of payment

No payment may be made under this subchapter for a designated health service
which is provided in violation of subsection (a)(1) of this section.

(2) Requiring refunds for certain claims

If a person collects any amounts that were billed in violation of subsection (a)(1)
of this section, the person shall be liable to the individual for, and shall refund on
a timely basis to the individual, any amounts so collected.

42 U.S.C. § 1395nn(a), (g).

21. The Stark Law broadly defines "financial relationship" to include any "compensation

arrangement" between the provider and the referring physician. 42 U.S.C. § 1395nn(a)(2).

"Compensation arrangement" is further defined to mean "any arrangement involving any

remuneration between a physician . . . and an entity." "Remuneration" means "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(A), (B).

22. Under Stark, a physician "referral" includes establishing a plan of care or certifying a patient for home health care. 42 U.S.C. § 1395nn(h)(5)(B). Stark regulation 42 C.F.R. § 424.22(d)(1) states that "[i]f a physician has a financial relationship . . . with an HHA, the physician may not certify or recertify need for home health services provided by that HHA, establish or review a plan of treatment for such services, or conduct the face-to-face encounter required under sections 1814(a)(2)(C) and 1835(a)(2)(A) of the Act unless the financial relationship meets one of the exceptions set forth in § 411.355 through § 411.357 of this chapter."

23. There are statutory and regulatory exceptions to the Stark Law that permit certain financial relationships between health care providers and physicians without triggering Stark's referral, billing, and payment prohibitions. 42 U.S.C. § 1395nn(b); 42 C.F.R. § 411.357. However, the referral and billing prohibitions of the Stark Law fully apply when a home health agency provides monetary compensation to a physician: where the provision of that gift takes into account the volume or value of that physician's patient referrals; where the physician or physician's staff solicits the compensation; or where the compensation is intended to induce or reward patient referrals in violation of the AKS.

## V.    MEDICARE PAYMENT FOR HOME HEALTH SERVICES

24. Under Medicare, the United States pays for certain home health services rendered to Medicare beneficiaries who meet specific coverage requirements. 42 U.S.C. 1395d(a)(3), 1395k(a)(2)(A). Services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or

7

intermittent skilled home health aide services, and medical social services. 42 U.S.C. § 1395x(m).

25. Medicare will pay for home health services only if a physician certifies that:

(1) the patient needs skilled nursing care, speech-language pathology, or physical or occupational therapy;

(2) the patient is confined to the home ("homebound"); and

(3) a plan of care has been established by and is periodically reviewed by a physician.

42 C.F.R. § 424.22; 42 C.F.R. §§ 409.41, 409.42. The physician must re-certify that these conditions exist, and re-certify a plan of care for the patient, at least once every sixty days if the home health agency wishes to submit further claims to Medicare for additional episodes of care. *Id.*

26. Throughout the relevant period, Medicare has paid home health providers under what is known as the Prospective Payment System ("PPS"). Medicare payments under PPS are based upon sixty-day "episodes" of care. The PPS rate is intended to reimburse the home health agency for all reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services required for the care of an individual patient during that sixty days. The amount of the payment for each sixty-day episode of care is adjusted to account for the patient's health condition, clinical characteristics, and service needs.

27. The adjustment in payment for the patient's health condition, clinical characteristics, and service needs is known as the case-mix adjustment. CMS has currently established eighty (80) case-mix groups, or Home Health Resource Groups ("HHRGs"), in which to classify patients for payment purposes.

28. At the beginning of each sixty-day episode of care, the home health agency assesses the patient's condition and likely need for skilled nursing care or therapy using an instrument called

8

the Outcome and Assessment Information Set ("OASIS"). The OASIS contains certain data elements designed to assess a patient's "clinical severity domain," "functional status domain," and "service utilization domain." Each data element is assigned a score value. The HHRG in which the patient falls, and the Health Insurance Prospective Payment System ("HIPPS") code used to determine the home health agency's payment amount, is determined by summing the score values reflected on the OASIS.

29. CMS contracts with regional home health intermediaries ("Intermediaries") to assist in the administration of home health claims processing and payment. Home health providers submit claims for payment from Medicare to these Intermediaries.

30. For initial episodes of care, Medicare pays 60% of the estimated payment for the sixty-day episode of care as soon as the Intermediary receives the home health provider's initial claim. The estimated payment is based upon the patient's HHRG, which, as described above, is derived from the OASIS. The residual 40% of the payment is made at the close of the sixty-day episode, unless there is some applicable adjustment to the payment amount. For subsequent episodes of care, the initial and residual payments are split evenly.

31. After the sixty-day episode of care has concluded, a patient may be re-certified for an additional sixty-day period or periods of care, provided that such home health care remains reasonable and necessary to the treatment of the patient's condition and otherwise meets Medicare's coverage rules.

32. Medicare also reimburses physicians for care plan oversight ("CPO"). CPO is indicated for the supervision of a patient under the care of a Medicare certified home health agency. Its code is G0181 and reimbursement rates vary by geographic area and are approximately $115-$130 per month.

33. Medicare allows payment for CPO services under the following conditions:

- The beneficiary must require complex or multi-disciplinary care modalities requiring ongoing physician involvement in the patient's plan of care;
- The beneficiary must be receiving Medicare covered home health services during the period in which the care plan oversight services are furnished;
- The physician who bills CPO must be the same physician who signed the home health plan of care;
- The physician must furnish at least 30 minutes of care plan oversight within the calendar month for which payment is claimed and no other physician has been paid for care plan oversight within that calendar month;
- The physician must have provided a covered physician service that required a face-to-face encounter with the beneficiary within the 6 months immediately preceding the provision of the first care plan oversight service;
- The CPO billed must not be routine post-operative care provided in the global surgical period of a surgical procedure billed by the physician;
- The CPO services must be personally furnished by the physician who bills them;
- Services provided "incident to" a physician's service do not qualify as CPO and do not count toward the 30-minute requirement;
- The physician may not bill CPO during the same calendar month in which he/she bills the Medicare monthly capitation payment (ESRD benefit) for the same beneficiary; and
- The physician billing for CPO must document in the patient's record which services were furnished and the date and length of time associated with those services.

34. Physicians may not bill for CPO services if they have a significant financial relationship with the HHA. A significant financial relationship is defined as receiving any compensation as an officer or director of HHA.

## VI.    RHC'S STATEMENTS AND SUBMISSIONS TO MEDICARE

35. At all times relevant herein, RHC submitted claims for payment to Medicare electronically, through the Intermediary. In order to do so, RHC entered into an Electronic Data Interchange ("EDI") Enrollment Agreement.

36. As part of that EDI Enrollment Agreement, RHC agreed to "submit claims that are accurate, complete, and truthful." In signing the EDI Enrollment Agreement, RHC acknowledged that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under Medicare, and that anyone who misrepresents or falsifies or

causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

37. To the extent that RHC did not submit electronic claims for payment during the relevant period, it submitted claims to Medicare using Form CMS-1450 (UB-04). Each Form CMS-1450 submitted contained the following certifications and/or acknowledgements:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).

38. Claims submitted by way of Form CMS-1450 were also presented by RHC to the Intermediary, which would process those claims for payment on behalf of Medicare.

39. In order to be paid for services furnished to Medicare beneficiaries, a home health agency must file an annual cost report with the relevant Intermediary. 42 C.F.R. § 05.1801(b)(1). The cost report contains certain provider information including utilization data, cost data, and PPS payment data.

40. RHC submitted cost reports to the Intermediary for each year during the relevant period.

41. The cost reports submitted by RHC during the relevant period contain the following acknowledgments:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a

kickback or were otherwise illegal, criminal, civil and administrative action, fine and/or imprisonment may result.

42. In order to submit a complete cost report, and thereby remain eligible to receive Medicare payments, RHC was required to make the following certification in its cost report each year:

> I hereby certify that I have read the above statement and that I have examined the accompanying home health agency cost report and the balance sheet and statement of revenue and expenses prepared by Nurses Registry and Home Health, [Provider Number] 187109 for the cost report period . . ., and that to the best of my knowledge and belief, it is a true, correct, and complete report prepared from the books and records of the provider . . . . I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

43. RHC was required to certify that its cost report as filed with the Intermediary was (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that it was entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the cost report is based upon all information known to RHC; and (4) that the services identified in the cost report were not corrupted by kickbacks, were billed in compliance with the Stark Statute, and were otherwise provided in compliance with all applicable health care laws and regulations.

44. Physicians who referred patients to RHC and established a plan of care or certified the patient for home health care submit to Medicare a Health Insurance Claim Form, Form CMS-1500 ("1500 Form") when requesting reimbursement for CPO services.

45. The 1500 Form contains the following notice and certification:

> NOTICE: Any person who knowingly files a statement of claim containing any misrepresentations or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties. NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or

12

concealment of a material fact, may be prosecuted under applicable Federal or State laws.

## VII.   FACTUAL BACKGROUND

46. RHC provides home health services to Medicare beneficiaries through its five offices located in Florida.

47. RHC sales representatives operating out of each of the five offices have the same duties and participate in regular sales calls lead by Castillo.   Generally, sales representatives disseminate information regarding RHC's services to hospitals, nursing homes, assisted living facilitates, and physicians' offices, and establish and maintain positive relationships with patients and referral sources.   More specifically, RHC sales representatives build and maintain relationships with physicians who may refer patients in need of home health services to RHC.

48. RHC sales representatives are paid salaries and have the opportunity to make a monthly bonus and commission. Bonus payments are awarded when sales representatives make typically 20 admissions per month; commissions are paid when sales representatives meet revenue goals of typically $60,000 per month.

49. Some RHC sales representatives provided certain physicians and other referral sources with remuneration to induce, in whole or in part, the referral of patients to RHC for home health services.

50. RHC, including the Conklin and Castillo, knew of this remuneration, and as described in detail below, at times directly and personally authorized and instructed sales representatives to pay remuneration to referral sources.

51. The remuneration took the form of Director or Medical Consultant agreements.   Under these agreements, physicians would refer patients to RHC in exchange for reviewing five patient charts each month and earning between $2,000-2,500 per month for these services.   Relator

states that the physicians were grossly overpaid for the amount of work they performed in order to induce these physicians to refer patients to RHC.

52. Relator first learned of the remuneration RHC paid to certain physicians to induce them to make referrals to RHC when he began his training in January or February 2010. Relator was trained for two days by Laurie Wildtraut ("Wildtraut"). At this training, Relator learned that RHC offered certain physicians that would refer a significant number of patients to RHC Director or Medical Consultant agreements.

53. Shortly after his training, Relator was asked to visit Dr. Portnow, a physician previously being called on by another RHC sales representative. After a few days of having the Dr. Portnow account, the RHC sales representative formerly in charge of the account learned that the home health services company that Dr. Portnow previously had a director or consultant agreement with went out of business and the RHC sales representative took the account back from Relator and offered Dr. Portnow a Medical Consultant agreement with RHC. Weeks later, Conklin came to the RHC office located in Sarasota and finalized the Medical Consultant agreement with Dr. Portnow.

54. Relator met with Conklin at this time and asked him about the Director and Medical Consultant agreements. Conklin stated that if Relator could find a physician who had business to send to RHC, that Relator should contact Wildtraut. Conklin would then determine if RHC would be interested in pursuing this physician as a Medical Consultant. Conklin told the Relator that he was open to finding good physicians that wanted to "partner" with RHC.

55. Subsequently, on numerous occasions Relator heard from other sales representatives that Conklin worried about the Medical Consultants and was considering eliminating the agreements

14

due to the liability they were causing.   However, to date, Conklin has not ended the Director and Medical Consultant agreements.

56. A current RHC sales representative informed Relator that Leslie Schlacher, a successful sales representative operating out of the RHC office in The Villages, stated that if Conklin eliminated the Medical Consultants it would drastically hurt her business.  Upon information and belief, Schlacher has negotiated Director and Medical Consultant agreements with several physicians.

57. In September 2012, Relator was asked by Castillo to sign Dr. John Moor, and orthopedic surgeon, up as a RHC Medical Consultant.  Relator sent an email to Castillo on September 18, 2012 asking, "[i]s the number of referrals still 10 that he needs to refer if he is interested in becoming a consultant?"  Castillo responded, "Yes, 10 would be a great number..."

58. In preparation for his meeting with Dr. Moor, Relator sent another email to Castillo on September 18, 2012 stating: "I have a copy of the medical consultant agreement and noticed that there is not any language in it about the 10 referrals a month that you had mentioned.  Is that something that needs to be added or do I just verbally tell him?  I know he definitely has 10 patients a month that he can send."  Castillo responded stating "Verbally only ....".

59. Relator was terminated before he could sign Dr. Moor up as a RHC Medical Consultant, however in October 2012, an RHC sales representative informed Relator that Wildtraut was continuing on where Relator left off and was trying to get Dr. Moor to sign on as a Medical Consultant.

60. Relator knows that RHC has signed up at least the following physicians as Director or Medical Consultants: Dr. Michael Feiertag, Dr. Arthur Portnow, Dr. Arnoldo Perez-Singh, Dr. Richard Giro Samale, and Dr. Brian Schofield.

61. Although not currently, Dr. Michael Feiertag was a RHC Medical Consultant and referred patients to RHC in exchange for remuneration.

62. Dr. Arthur Portnow has been a RHC Medical Consultant since April 2012. Dr. Portnow consistently referred patients to RHC for home health services. From January 1, 2011 through September 11, 2012, Dr. Portnow referred a projected total of approximately $78,000 in sales to RHC.

63. Dr. Richard Giro Samale has been a RHC Medical Consultant since 2011. Dr. Samale consistently referred patients to RHC for home health services. From January 1, 2011 through September 9, 2012, Dr. Samale referred a projected total of approximately $140,000 in sales to RHC, including 165 episodes and 49 "start of care" episodes.

64. Dr. Brian Schofield has been a RHC Medical Consultant since Spring 2012. Dr. Schofield consistently referred patients to RHC for home health services. From January 1, 2011 to September 11, 2012, Dr. Schofield referred a projected total of approximately $263,000 in sales to RHC, including 340 episodes and 108 start of care episodes.

65. Dr. Arnoldo Perez-Singh has been a RHC Medical Consultant since November 2011. Dr. Perez-Singh consistently referred patients to RHC for home health services. From January 1, 2011 though September 11, 2012, Dr. Singh referred a projected total of approximately $361,000 in sales to RHC, including 346 episodes of care and 110 "start of care" episodes. After Singh signed a Medical Consultant agreement with RHC his referrals increased, demonstrating that the remuneration paid by RHC did in fact induce Singh to refer more patients to RHC. For example, from January 1, 2012 to September 20, 2012, when Singh was a Medical Consultant, he referred a projected total of approximately $234,000 in sales, including 235 episodes and 71 "start of

care" episodes.  Comparatively, in 2011 when Singh was not a Medical Consultant, Singh referred less than $118,000 in sales, including only 111 episodes and 39 "start of care" episodes.

66. Significantly, in July 2012, RHC Medical Consultant Dr. Singh didn't receive a check in exchange for making his referrals in accordance with his agreement on the date that Conklin was supposed to have sent it.  As a result of not receiving his check, Dr. Singh did not refer any patients to RHC for two weeks.  Once Dr. Singh received his check, Dr. Singh again began referring patients to RHC.  To prevent this from happening again, Conklin gave blank checks to Wildtraut to make sure Dr. Singh was sent timely checks to RHC could obtain patient referrals from him.

67. Upon information and belief, RHC has offered remuneration to multiple other physicians and other referral sources in exchange for the referral of Medicare patients to RHC for home health services.  Relator has been informed that RHC has paid this remuneration to physicians in exchange for patient referrals prior to Relator's hiring and has knowledge that RHC is continuing to pay this remuneration during the present time.

68. All of the physicians that RHC pays remuneration to in exchange for referrals have a financial relationship with RHC.  For the referrals that they make to RHC, these physicians certify or recertify need for home health services provided by RHC, establish or review a plan of treatment for such services, or conduct the face-to-face encounter required by law in violation of the Stark Law.

69. In addition, RHC assists all of the physicians that RHC pays remuneration to in exchange for referrals or has a financial relationship with, in billing for CPO services.  Billing for CPO services when the physician has a financial relationship with RHC is prohibited under the AKS and Stark Law.  RHC also assists physicians that refer patients to RHC in billing for CPO

services that physicians either failed to perform altogether and when physicians did not see the patients.

70. The strategy of paying kickbacks to physicians for referrals of patients has proven successful, from January to September 2011, the RHC Sarasota office collected approximately $1.9 million in projected sales and Castillo stated on a sales call that RHC's revenues were $14 million for 2011 and he believes RHC's revenues will double in five years.

## VIII.   DEFENDANTS' FALSE CLAIMS

71. As detailed above, RHC submitted claims to Medicare for reimbursement of the home health services it provided to beneficiaries.

72. RHC made certifications in its EDI enrollment agreement, CMS Form 1450 and cost reports filed with the government that its submissions were (1) truthful; (2) correct; (3) complete; and (4) that the services were not corrupted by kickbacks, were billed in compliance with the Stark, and were otherwise provided in compliance with all applicable health care laws and regulations.

73. Defendants violated the AKS by offering remuneration, in the form of Director and Medical Consultant agreements, to physicians to induce physicians to make referrals to RHC for home health services payable by Medicare.  Medicare does not cover items that are provided because of illegal inducements, and all claims for payment for those items are false.

74. Defendants also violated Stark Law because the physicians that RHC pays remuneration to in exchange for referrals have a financial relationship with RHC under Stark.  These physicians certify or recertify need for home health services provided by RHC, establish or review a plan of treatment for such services, or conduct the face-to-face encounter required by law; doing so violates Stark.

75. Defendants caused physicians who submitted claims for reimbursement for CPO services on a Form 1500 to submit false claims because either the physicians did not perform the CPO services and/or the physician had a financial relationship with RHC in which case the physicians were not allowed to bill for CPO services.

76. Compliance with the federal AKS and Stark Law is a precondition to payment from Medicare.

77. Each of the claims submitted to Medicare for reimbursement of home health services provided to beneficiaries, was accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules. Each of those certifications was false, because each claim for payment was tainted by the kickbacks detailed in this Complaint.

78. Given the specific statements made by RHC management, specifically owner Conklin, and the more than 10 years of regulatory guidance with respecting to such arrangements, RHC – an experienced health care provider with detailed knowledge of the laws applicable to government programs – knew that the claims were tainted by the kickback scheme, and thus were not reimbursable by Medicare.

79. Knowingly submitting or causing the submission of claims for prescription drugs which are not reimbursable creates liability under the FCA.[1]   Thus, each of these claims to the government from Defendants constituted a violation of section 3729 of the FCA.

---

[1] Knowingly causing the submission of claims that are ineligible for payment under a federal healthcare program constitutes a violation of the FCA. *See U.S. ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D. Mass. 2001); *See also U.S. ex rel. Nowak v. Medtronic, Inc.*, Case Nos. 1:08-cv-10368 and 09-cv-11625, D. Mass. (United States of America's Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program . . . because the program places other conditions on coverage that are not satisfied, the claim is false"), and *U. S. v. Medco Physicians Unlimited*, 2000 U.S. Dist. LEXIS 5843, at *27 (N.D. Ill. Mar. 15, 2000) (granting partial summary judgment for plaintiff on the issue of liability with respect to its claim that Medco submitted false claims for non-reimbursable meals and transportation costs.)

### COUNT I
### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729(A)(1)(A)

80. Relator re-alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

81. At all relevant times to this Complaint, Defendants knowingly presented, or caused to be presented, directly or indirectly false and fraudulent payment or approval to the United States, including claims for payment for services rendered to patients unlawfully referred to Defendants by physicians and others to whom Defendants provided kickbacks and/or illegal remuneration and/or with whom Defendants entered into prohibited financial relationships, in violation of the AKS and Stark Law.

82. By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, the United States suffered damages.

### COUNT II
### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729(A)(1)(B)

83. Relator re-alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

84. At all times relevant to this Complaint, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid. Such false material records and statements include, but are not limited to, the false certifications made on RHC's cost reports and the false entries in OASIS reports and other medical records.

85. By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, the United States suffered damages.

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: November 2nd, 2012

Respectfully submitted,

Steven G. Wenzel, Esq.
Florida Bar Number: 159055
WENZEL FENTON CABASSA, P.A.
1110 North Florida Avenue, Suite 300
Tampa, FL 33602
Phone: 813-440-4593
Fax: 813-229-8712
Email: swenzel@wflcaw.com

and

BERGER & MONTAGUE, P.C.
Daniel R. Miller (PA Bar No. 68141)
Shauna B. Itri (PA Bar No. 201611)
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
dmiller@bm.net
sitri@bm.net